IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYANNE REGMUND, GLORIA JENSSEN, MICHAEL NEWBERRY and CAROL NEWBERRY, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs | ) ) ) | Civil Action No. 16-711 Judge Cercone |
| TALISMAN ENERGY USA, INC., Defendant. | ) ) | Magistrate Judge Mitchell |

I.    <u>Recommendation</u>

It is respectfully recommended that the Motion to Transfer Venue Pursuant to 28 U.S.C.

§ 1404 filed by defendant, Talisman Energy USA Inc. (ECF No. 9) be granted and that this

action be transferred to the United States District Court for the Southern District of Texas,

Houston Division.

II.    <u>Report</u>

Plaintiffs, Rayanne Regmund, Gloria Jenssen, Michael Newberry, and Carol Newberry,

have filed this class action alleging that Defendant, Talisman Energy USA, Inc. (Talisman),

breached oil and gas agreements by reducing production volumes by 20% and attributing it to

"shrinkage" in the volume of gas lost to condensate in the transportation stream.  Talisman has

denied the allegations of the Complaint.

Currently pending before the Court is Talisman's motion to transfer venue to the United

States District Court for the Southern District of Texas, Houston Division, pursuant to 28 U.S.C.

§ 1404(a).  For the reasons that follow, the motion should be granted.

<u>Facts</u>

Plaintiffs and Class Members own royalty rights and interests in arising from oil and gas

leases in the South Texas Eagle Ford shale play ("Eagle Ford"). These royalty interest owners include individuals, partnerships, trusts, corporations and other entities residing both in Texas, and throughout the United States.  Talisman is an upstream oil and gas production company; an indirect subsidiary of Calgary, Alberta-based Talisman Energy, Inc., ("TEI") which was acquired for $13 billion by an affiliate of the Spanish integrated energy company Repsol S.A. on May 8, 2015.  In Texas, gas and oil leases permit royalty payments to be calculated based on the amount of gas or oil produced as determined either at the wellhead or the amount that enters the pipeline for sale. Royalty payments are controlled by the lease language and may be based on production of oil and gas, or sales of the produced oil and gas. It is common for lease use for operations to be excluded from royalty payments.  (Compl. ¶¶ 10-12.)

Plaintiffs indicate that, according to the U.S. Energy Information Administration, the production of natural gas is the volume withdrawn from reservoirs less: (1) the volume returned to such reservoirs in cycling; (2) shrinkage resulting from the removal of lease condensate; and (3) nonhydrocarbon gases that occur in sufficient quantity to render the gas unmarketable. The production of natural gas at a well site is calculated daily at the wellhead by a meter.  Oil production is the amount produced from oil reservoirs during given periods of time, measured as volumes delivered from lease storage tanks to pipelines, trucks, or other media for transport to refineries.  (Compl. ¶¶ 13-14.)

Pursuant to Texas oil and gas law, the operating entity is responsible for reporting all required well production data to Texas Comptroller of Public Accounts ("Texas Comptroller"). Title 16, Tex. Nat. Res. Code.  Reports to the Texas Comptroller include both volumes sold and revenues received, by product reported.  Texas law also requires that any entity paying oil and gas royalties must accompany the payment with a check stub from the payor containing details,

2

inter alia, of well identification, volume of production, price, decimal interest (the royalty owner's share of production from the drilling unit), expense deductions and taxes. Tex. Nat. Res. Code §§ 91.501-91.502. The required check stub detail is intended to allow the royalty recipient to verify that the payment accords with the payor's obligation under applicable leases.  (Compl. ¶¶ 15-16.)

In 2010, Talisman entered the Texas oil and gas market and opened a Texas office, whereby it acquired extraction rights under numerous oil and gas leases in the Eagle Ford shale including those owned by Plaintiffs and the Class Members.  Talisman also entered into the South Texas Joint Development Agreement (the "Development Agreement") which created a joint venture between Talisman and Statoil, Inc. to explore, develop, and produce oil and gas. Statoil also owns extraction rights under numerous oil and gas leases in the Eagle Ford.  The Development Agreement obligated the well operator to report all well production data to the non-operating partner in a manner consistent with and as required by the Texas Comptroller, so that both the operator and non-operating partner could comply with Texas Case law governing royalty payments, expenses, adjustments and deductions thereto, and documentation including check stubs to mineral rights owners.  Under the Development Agreement, Talisman and Statoil agreed to divide the oil and gas production on a 50-50 basis. Talisman and Statoil sell their own share of the production, are required to report their half of the volumes to royalty owners, and must pay royalty owners based on the production pursuant to the terms of each royalty owner's lease.  (Compl. ¶¶ 17-19.)

Plaintiffs state that they and Class Members are owners of the royalty rights for oil and gas leases in Eagle Ford that establish their rights to royalty payments and the amounts they are to be paid based on the volume of gas and oil produced. The Development Agreement did not

change royalty owners' rights to payments based on the volume of gas and oil produced. Initially, Talisman acted as operator for all of the Eagle Ford joint venture acreage, with Statoil retaining a non-operating working interest. As the operator of record, Talisman was responsible for reporting the oil and gas production to the Texas Comptroller and to royalty owners. Plaintiffs allege that Talisman has admitted that when it entered the Texas oil and gas market, it did not have the capability to manage the complexities of the leases it was purchasing and entering into.  (Compl. ¶¶ 20-22.)

Effective July 1, 2013, Talisman and Statoil modified their Development Agreement so as to divide responsibility for drilling and operating wells in the joint venture acreage, including those in which Plaintiffs and Class Members owned royalty interests.  According to the Development Agreement modification effective July 1, 2013, Talisman continued operating wells within the western portion of the shared holdings, and Statoil agreed to operate the wells in the eastern portion of the shared holdings. The Development Agreement provided that Talisman and Statoil each owned non-operating working interests in the leases on which the other entity served as the operator.  (Compl. ¶¶ 23-24.)

In December 2015, Statoil and Talisman further amended the Development Agreement to provide that Statoil now serves as operator for all wells within the joint venture acreage, with Talisman retaining a non-operating working interest.  Plaintiffs state that, unbeknownst to them, Talisman implemented a scheme to alter wellhead production data received from Statoil, reducing the measured volumes of gas and oil by an arbitrary 20% (the "Skim").  Following application of the Skim, the reduced production data was uploaded into Talisman's royalty payment accounting system and used to pay royalty owners a reduced royalty amount.  Plaintiffs allege that Talisman increased the Skim to as much as 30% in February 2015. Beginning no later

4

than July 2013, Talisman began to issue royalty payments and accompanying check stubs which reflected production amounts and royalty payments that were approximately 20% smaller than the production amounts and royalty payments issued by Statoil for the same wells, same royalty owners, same time periods and under the same leases.  Plaintiffs further allege that the Talisman check stubs actually reflect smaller production amounts than reported to the Texas Comptroller due to Talisman's improper use of an arbitrary reduction of the production amounts – the "Skim" – of up to 20%.  (Compl. ¶¶ 25-27.)

Plaintiffs allege that, beginning with royalty payments attributable to the month of February 2015, Talisman appears to have increased the "Skim" to approximately 30% based on check stubs which reflected production amounts and royalty payments that were approximately 30% smaller than the production amounts and royalty payments issued by Statoil for the same wells, same royalty owners, same time periods and under the same leases.  Because the Development Agreement required Talisman and Statoil to share production and pay royalties on a 50-50 basis, and Talisman's royalty payments were consistently smaller than Statoil's, Plaintiffs contend that Talisman was shorting the royalty payments in some way.  However, due to the information and format of Talisman's check stubs which were different from the information and format of Statoil's check stubs and for production during different time periods than those reflected on Statoil's check stubs, it was difficult, if not impossible, for Plaintiffs to determine the net difference, let alone the reason for the net difference, in royalty payments. Plaintiffs allege that Talisman has admitted to reducing the royalty payments by 20% based on "shrinkage," which it defined as being volume of gas lost due to condensate in the transportation stream. They also allege that Talisman admitted that if it could not justify its lower production volume, it would be legally responsible to make additional royalty payments to royalty owners

pursuant to their respective lease agreements.  (Compl. ¶¶ 28-30.)

In response to royalty owners' questions regarding the difference in the royalty payments between Talisman and Statoil, Talisman explained away the Skim by contending that in transporting and marketing oil, certain volumes of condensate (light oil) did not qualify for royalty payments because they are lost to "shrinkage."  In the oil and gas industry, shrinkage refers to the difference between the amounts of gas produced at the wellhead and the gas that enters a pipeline for sale caused by release of solution gas and/or evaporation of the liquid. Shrinkage attributable to a given well is not a static percentage and there is no domestic oil industry standard or common practice which allows for application of a fixed shrinkage factor to reported volumes of crude oil or condensate. Moreover, based upon information and belief, Talisman's own personnel concluded that shrinkage, if applicable, could never approach the 20% Skim, and certainly never 30%. Critically, oil and gas leases may specify that royalty payments are based on produced volumes which would therefore preclude adjustments for "shrinkage." (Compl. ¶¶ 28-32.)

Any reduction of royalty payments under a mineral rights lease must be permitted by the lease contract and justified, either from actual measurement or established American domestic oil industry standards. Plaintiffs state that Talisman's Skim meets none of these requirements. Plaintiffs contend that their oil and gas rights leases do not permit the reduction of royalty payments by a static amount for any reason, including "shrinkage" or because of Talisman's Skim.  Rather, royalty payments must be based on actual amount of gas or oil produced. Regardless of whether the production volume is measured at the well head, after separation, or at the point of sale, under no circumstances do the applicable leases permit the aforementioned Skim.  Plaintiffs contend that, in employing the Skim for the purpose of shorting royalty

6

payments to Plaintiffs and Class Members, Talisman engaged in actions that were arbitrary, capricious, and in bad faith.  They further allege that Talisman has arbitrarily manipulated production volumes and royalty payments from joint venture wells operated by Talisman reported to the Texas Comptroller.  Plaintiffs state that they have complained to Talisman about the aforementioned discrepancies between royalty checks from Talisman and Statoil, but Talisman has offered only misleading explanations.  Furthermore, Talisman has neither made nor offered restitution to royalty owners for payment shortages attributable to the Skim.  Plaintiffs allege that Talisman continues to short them on royalties attributable to wells operated under the Development Agreement and operated by Statoil which, as of January 1, 2016, includes all of the wells and royalty owners within the Development Agreement.  (Compl. ¶¶ 33-39.)

Procedural History

Plaintiffs filed this action on May 31, 2016 (ECF No. 1).  Jurisdiction is based on the Class Action Fairness Act of 2005 (CAFA) in that: the named Plaintiffs are Texas citizens; Talisman is a Delaware corporation with its principal place of business in Warrendale, Pennsylvania; and the amount in controversy exceeds the sum of $5,000,000 collectively, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2).  (Compl. ¶¶ 4-8.)  Count I alleges a claim of breach of contract.  Count II seeks an accounting.  Count III alleges a breach of the implied covenant of good faith and fair dealing.  Count IV alleges a claim of unjust enrichment. Finally, Count V seeks a declaratory judgment.

On June 23, 2016, Defendant filed an answer and counterclaims overpayment, reimbursement for drilling and operating costs, and attorney fees (ECF No. 8).  It also filed a motion to transfer venue (ECF No. 9).  Plaintiffs filed a response to the motion on July 28, 2016 (ECF No. 17).  Defendant filed a reply brief on August 8, 2016 (ECF No. 19).  Plaintiffs filed a

sur-reply brief on August 15, 2016 (ECF No. 24).

Standard of Review

Section 1404(a) of Title 28 of the United States Code states that:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). Thus, resolution of a transfer motion requires three steps: 1) determine whether the proposed transferee court is a venue where the action "might have been brought" under the federal venue statute; 2) evaluate the relevant "private factors" relating to "the convenience of parties and witnesses"; and 3) examine the "public factors" relating to "the interest of justice" and weigh them to determine if the action should be transferred. Shutte v. Armco Steel Corp., 431 F.2d 22, 24-25 (3d Cir. 1970); Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). See In re Volkswagen of America, Inc., 545 F.3d 304, 312, 314 (5th Cir. 2008) (en banc).

Defendant argues that this action could have been brought in the Southern District of Texas, inasmuch as it has offices (the very offices responsible for Eagle Ford operations) in The Woodlands, a suburb of Houston, which is in Montgomery County, Texas, part of the Houston Division of the Southern District. (Smith Aff. ¶ 3.)[1] 28 U.S.C. § 124(b)(2). An action may be brought where a defendant "resides," 28 U.S.C. § 1391(b)(1), and a corporation "resides" in any judicial district in which it is subject to the court's personal jurisdiction, § 1391(c)(2). Plaintiffs have not disputed this argument in opposing the transfer and this appears to be a proper conclusion. See Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc., 2010 WL 170403, at *3 (W.D. Pa. Jan. 14, 2010) ("PLS") (action could have been brought in the Eastern District of

---

[1] Def.'s Mot. to Transfer (ECF No. 9) Ex. A.

Michigan, where defendant had offices).

In addition, Defendant argues that the action could have been brought in the Southern District of Texas because a substantial part of the events or omissions allegedly giving rise to the claims occurred there.  28 U.S.C. § 1391(b)(2).  As discussed below, Plaintiffs dispute where a substantial part of the events giving rise to their claims occurred.

Deference to Plaintiffs' Chosen Venue

Ordinarily, a court must "give some weight to the plaintiffs' choice of forum."  Atlantic Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex., 134 S.Ct. 568, 581 n.6 (2013) (citing Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955)).  "The burden for establishing the need for transfer still rests with the movant … [and] in ruling on defendants' motion the plaintiff's choice of venue should not be lightly disturbed."  Jumara, 55 F.3d at 879 (citations omitted).

Plaintiffs argue that a strong presumption applies here and that their choice of forum is entitled to "paramount consideration."  Shutte, 431 F.2d at 25.  However, this argument is flawed in that it is based on a formulation that first appeared in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947), but that case was decided under the doctrine of forum non conveniens.  The Supreme Court has made clear that: "District courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of forum non conveniens."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 253 (1981).  See also Norwood, 349 U.S. at 32 ("Congress, by the term 'for the convenience of parties and witnesses, in the interest of justice,' intended to permit courts to grant transfers upon a lesser showing of inconvenience.")  See In re Volkswagen, 545 F.3d at 313-15 (district court erred in requiring the defendant to show that the § 1404(a) factors substantially outweighed the plaintiff's choice of venue, improperly applying the stricter forum non conveniens standard).  In addition, if a plaintiff's choice of forum were always entitled to

"paramount consideration," it would make no sense to list the defendant's preference as a factor to be weighed, Jumara, 55 F.3d at 879, because by definition in any venue transfer situation the defendant will have moved to transfer the case to a venue that the plaintiff does not favor.

Moreover, Defendant cites case law to the effect that:

> the weight accorded to plaintiff's choice of forum is considerably reduced in class and derivative actions, where each of many potential plaintiffs may claim the right to have the action heard in his home forum, and where the nominal plaintiff's role in the litigation is likely to be quite minimal.  Koster v. Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

Bolton v. Tesoro Petroleum Corp., 549 F. Supp. 1312, 1313-14 (E.D. Pa. 1982) (other citations omitted).  See also In re Warrick, 70 F.3d 736, 741 n.7 (2d Cir. 1995); Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987); Job Haines Home for the Aged v. Young, 936 F. Supp. 223, 228 (D.N.J. 1996).[2]

The Supreme Court has also held that: "When the plaintiff's choice is not its home forum … the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable.'"  Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430 (2007) (quoting Piper Aircraft Co., 454 U.S. at 255-56). This principle applies whether the plaintiff is a resident of another state or a foreign country.  See High River Ltd. P'ship v. Mylan Labs., Inc., 353 F. Supp. 2d 487, 498-99 (M.D. Pa. 2005) (plaintiff, which was organized under the laws of Delaware and had its principal place of business in New York, brought suit in the Middle District of Pennsylvania, so its choice of forum was entitled to less weight); Bannister v. Wal-Mart Stores East, L.P., 843 F. Supp. 2d 610, 615

---

[2] Although the Court of Appeals for the Third Circuit apparently has never addressed this specific issue, it has recognized other situations in which the deference owed to a plaintiff's choice of forum is reduced.  See, e.g., Kisano Trade & Invest Ltd. v. Lemster, 737 F.3d 869, 874 (3d Cir. 2013) (foreign plaintiff's choice of U.S. forum entitled to less deference).  Moreover, Plaintiffs have not argued that the Third Circuit would reject this position.

(E.D.N.C. 2012) (Virginia residents' choice of forum in North Carolina entitled to less weight).

The named Plaintiffs are all Texas citizens, who reside in the Texas cities of Kenedy (Regmund and the Newberrys) and Runge (Jenssen).[3]  Plaintiffs have not explained why filing suit in this forum, where none of them reside, demonstrates that litigating here is more convenient for them.  Indeed, they have not proffered any reason for choosing this forum.[4]  See Iragorri v. United Techs. Corp., 274 F.3d 65, 71-72 (2d Cir. 2001) (en banc) ("The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice.")  Thus, even if the Court accepted Plaintiffs' argument that their choice of venue must be accorded substantial weight (even if they do not reside in this District and even in a class action), that would still have no bearing on the Jumara factor of convenience to the plaintiffs.

Plaintiffs also argue that, because this District encompasses Defendant's principal place of business, Talisman cannot be heard to complain about inconvenience.  However, the case they cite does not support this contention.  See Viets v. Andersen, 2003 WL 21525062, at *10 (S.D. Ind. June 26, 2003) (on the defendant's motion to transfer the case to the Northern District of Illinois, it was the plaintiff, who "joined an Illinois partnership headquartered in the Northern District of Illinois [who] cannot seriously contend that arbitration or litigation in their old firm's headquarters is unfairly burdensome or inconvenient to them.")  Plaintiffs also cite a case for the

---

[3] Defendant acknowledges that both these cities are in Karnes County, which is part of the San Antonio Division of the Western District of Texas, not the Southern District to which it seeks transfer.  28 U.S.C. § 124(d)(4).  Nevertheless, Plaintiffs have not disputed that it would be less burdensome for them to travel approximately 150 miles within Texas, if necessary, than for them to have to travel to this district.  Talisman indicates that its leases are also in the counties of Bee, DeWitt, La Salle, Live Oak and McMullen, which are located in 4 divisions of the Southern District of Texas, and that its records show that 87% of its royalty owners have a mailing address in the State of Texas.  (Smith Aff. ¶¶ 9-10.)  Plaintiffs do not dispute these facts.

[4] It is noted that Plaintiffs' counsel appear to be based in this district.  However, "the convenience of counsel in a matter is not a relevant factor."  Kisano, 737 F.3d at 876.

proposition that "when the basis for a plaintiff's claim arises in a defendant's 'principal place of business, [that factor] is often the critical and controlling consideration in adjudicating transfer of venue motions." Chapman v. Dell, Inc., 2009 WL 1024635, at *4 (W.D. Tex. Apr. 15, 2009) (quoting Spiegelberg v. Collegiate Licensing Co., 402 F. Supp. 2d 786, 792 (S.D. Tex. 2005)). As discussed below, whether this case "arose" in Defendant's principal place of business is heavily disputed, but even the Chapman case does not hold that a plaintiff's act of filing a case in a defendant's principal place of business alone is sufficient to defeat a motion to transfer.

Nor does the law support this proposition.  See, e.g, In re Link_A_Media Devices Corp., 662 F.3d 1221, 1223-24 (Fed. Cir. 2011) (plaintiff brought suit in the District of Delaware and LAMD moved to transfer the case to the Northern District of California, where it had its principal place of business and employed nearly all of its workers, and the court – relying upon cases from the Third Circuit – held that the district court erred in relying heavily on the fact that LAMD was incorporated in Delaware in denying its motion).  Indeed, as noted below, a defendant's preferred venue is listed as a factor for a court to take into consideration on a transfer motion, but a defendant's principal place of business (like a defendant's state of incorporation) is not.  Moreover, Defendant argues that the operative facts took place in Texas; if true, this specific point would certainly outweigh any general reference to this District as Talisman's principal place of business.  Therefore, Plaintiffs' choice of this forum is entitled to less deference than it would otherwise receive, that is, some degree of deference but not "enhanced deference" or "paramount consideration."  PLS, 2010 WL 170403, at *3.

Other Factors

The Court of Appeals has noted that, in ruling on § 1404(a) motions, courts have not limited their consideration to the convenience of parties, witnesses, or interests of justice but

12

have considered many variants of the private and public interests protected by the language of

§ 1404(a).  Jumara, 55 F.3d at 879.  The court noted that:

> The private interests have included: plaintiff's forum preference as
> manifested in the original choice; the defendant's preference; whether the claim
> arose elsewhere; the convenience of the parties as indicated by their relative
> physical and financial condition; the convenience of the witnesses—but only to
> the extent that the witnesses may actually be unavailable for trial in one of the
> fora; and the location of books and records (similarly limited to the extent that the
> files could not be produced in the alternative forum).
>
> The public interests have included: the enforceability of the judgment;
> practical considerations that could make the trial easy, expeditious, or
> inexpensive; the relative administrative difficulty in the two fora resulting from
> court congestion; the local interest in deciding local controversies at home; the
> public policies of the fora; and the familiarity of the trial judge with the applicable
> law in diversity cases.

Id. at 879-80 (citations omitted).

Similarly, the Supreme Court has held that:

> In the typical case not involving a forum-selection clause, a district court
> considering a § 1404(a) motion (or a forum non conveniens motion) must
> evaluate both the convenience of the parties and various public-interest
> considerations.[6] Ordinarily, the district court would weigh the relevant factors and
> decide whether, on balance, a transfer would serve "the convenience of parties
> and witnesses" and otherwise promote "the interest of justice." § 1404(a).
>
> [6]Factors relating to the parties' private interests include "relative
> ease of access to sources of proof; availability of compulsory
> process for attendance of unwilling, and the cost of obtaining
> attendance of willing, witnesses; possibility of view of premises, if
> view would be appropriate to the action; and all other practical
> problems that make trial of a case easy, expeditious and
> inexpensive." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, n. 6,
> 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (internal quotation marks
> omitted). Public-interest factors may include "the administrative
> difficulties flowing from court congestion; the local interest in
> having localized controversies decided at home; [and] the interest
> in having the trial of a diversity case in a forum that is at home
> with the law." Ibid. (internal quotation marks omitted).

Atlantic Marine, 134 S. Ct. at 581 & n.6.[5]

Defendant argues that its proposed venue would be a more convenient forum based primarily upon the location of parties (including proposed class members) and witnesses. Plaintiffs respond that Defendant cites no facts in support of this argument, but instead imagines that some unnamed witnesses might reside in that forum who would be inconvenienced. Rather, Plaintiffs maintain that they have sued Defendant in its home forum and where the locus of activity related to the actions sued upon in this case arose.

Defendant replies that the true witnesses are in Texas, that the residence of a majority of the class members (which is in Texas) is relevant, that the underlying facts could also be said to have occurred in Texas (where the individuals responsible for making the important decisions reside) and that the case involves specific Texas rules and regulations that are not typical of breach of contract actions and therefore would be most familiar to judges in Texas courts. Plaintiffs dispute that Defendant's proffered witnesses are "critical" and contend that Defendant has conceded 6 of the 12 Jumara factors.

Private Factors

As explained above, Plaintiffs have chosen this forum, although their choice should be given only some deference because this is a class action and this is not their home forum; and Defendant has expressed a preference for the Southern District of Texas. The other private factors are: where the claim arose, the convenience of the parties, the convenience of witnesses and the location of books and records. Plaintiffs have not explained why this forum would be more convenient for them (and since they do not reside here, this would be a difficult position to

---

[5] The Supreme Court went on to modify the transfer analysis when a defendant relies upon a forum selection clause. Id. at 581-82. However, Defendant does not cite a forum selection clause in this case and therefore the regular balancing of factors applies.

maintain), but Defendant has stated that the Talisman employees with the most direct knowledge of the issues raised in this case and the pertinent records are located in its offices in The Woodlands, Texas.  (Smith Aff. ¶¶ 4-5.)  Thus, Defendant has proffered evidence that it would be more convenient for it to litigate this case in the Southern District of Texas.

Where the Claim Arose

Courts have recognized that the "most appropriate venue is generally 'where a majority of events giving rise to the claim arose.'"  Alcantarilla v. State Farm Mut. Auto. Ins. Co., 2015 WL 8785007, at *8 (W.D. Pa. Dec. 15, 2015) (McVerry, J.) (quoting In re Amkor Tech, Inc. Sec. Litig., 2006 WL 3847488 (E.D. Pa. Dec. 28, 2006)).  Plaintiffs contend that the operative facts occurred in this district, where Talisman made calculations about the amount of shrinkage at its corporate headquarters and from which it mailed the reduced royalty checks.  In support of this argument, they cite three pieces of evidence: (1) a letter written by a Talisman attorney which they contend describes "the reduction of production as a business decision made by Talisman, and not of its parent corporation Talisman Energy, Inc." (ECF No. 17 at 10) (citing Lison Decl. Ex. 1 at 6-8)[6]; (2) a letter sent by Talisman about royalty payments in which Talisman told royalty owners that they should send any correspondence regarding transfers in ownership, address updates and any other information to Talisman at its headquarters in Warrendale, Pennsylvania (Lison Aff. ¶ 8 & Ex. 5); and (3) a copy of a check for a royalty payment demonstrating that it was sent from Talisman's Warrendale office (Lison Aff. ¶ 9 & Ex. 6).

The first two pieces of evidence do not support Plaintiffs' contention.  Plaintiffs argue, in effect, that the letter implies that, because the decision was made "by Talisman" (and not its corporate parent) it was therefore made in Warrendale.  But the letter from the attorney says

_____

[6] ECF No. 18.

nothing about where the decision was made or by which individuals. Similarly, the fact that a letter sent to royalty owners directed that communications should be mailed to Talisman's offices in Warrendale does not mean that the operative facts relating to royalty payments occurred there.

The fact that the royalty checks (which underpaid the amount allegedly due) were sent from Warrendale is relevant for purposes of the venue issue. Plaintiffs cite <u>PLS</u> for the proposition that a "breach of contract arises where the defendant fails to make the necessary payments, not where the plaintiff fails to receive those payments." 2010 WL 170403, at *3.[7]

However, Defendant is not arguing that venue should be transferred to Texas because that is where the royalty checks were received by the Plaintiffs. Rather, Defendant maintains that:

> Talisman's office responsible for Eagle Ford operations in Texas is located in the suburbs of Houston Texas at 2455 Technology Forest Boulevard, The Woodlands, Texas, in Montgomery County.
>
> At this office are located [Scott Smith, District Landsman for Talisman], and other land personnel managing the Eagle Ford leases, engineers and staff responsible for production from the Eagle Ford leases, accounting personnel responsible for Eagle Ford leases, and management responsible for Talisman's Eagle Ford leases. Those employees responsible for measurement and allocation of oil and condensate, including accounting for condensate shrinkage, are located in The Woodlands. The Talisman employees with the most direct knowledge of the issues raised in this lawsuit are located in Talisman's offices in The Woodlands, Texas.

(Smith Aff. ¶¶ 3-4.)

Plaintiffs have not explained how they could possess superior information as to where the individuals at Talisman who made the decisions regarding royalty payments are located, and the Court concludes that they do not. Thus, although the royalty checks were sent from

---

[7] Nevertheless, as Defendant observes, the court's actual holding was that a company had two offices – a main office in Utah and a subsidiary office in Michigan from which payments were sent – and that the breach could have considered to have occurred in either location, but the issue was not dispositive and the case was not transferred to either state. <u>Id.</u> at *3-4.

Pennsylvania, Defendant has proffered evidence that the individuals responsible for determining the amount of the royalties to be paid are located in Texas. On the whole, this factor weighs in favor of transfer.

Convenience of Witnesses

Other cases hold that the most important factor is the convenience of witnesses. Headon v. Colorado Boys Ranch, 2005 WL 1126962, at *7 (E.D. Pa. May 5, 2005). Plaintiffs argue that every knowledgeable witness resides in this district and within the Court's subpoena power, but beyond the subpoena power of Talisman's preferred venue in Texas.

The parties argue at length about who the witnesses are and where they reside. As noted above, Defendant argues that key Talisman employees responsible for the decisions responsible for Talisman's Eagle Ford leases, for management and allocation of oil and condensate, including accounting for condensate shrinkage, are located in The Woodlands, Texas. (Smith Aff. ¶ 4.)[8] Plaintiffs respond that Mr. Smith does not state that he has personal knowledge about Talisman's across-the-board reduction in royalty payments or the measurement and reduction of production volumes attributable to "shrinkage" and that he does not specify any names of Talisman employees located in The Woodlands.

Plaintiffs identify two non-party witnesses in this case. The first is Todd Normane (Talisman's former vice president, general counsel and corporate affairs officer), who lives in

---

[8] Plaintiffs argue that Mr. Smith's "general statements" about witnesses is insufficient, citing Plum Tree, Inc. v. Stockment, 488 F.2d 754 (3d Cir. 1973). In that case, however, the defendant did not support its transfer motion with any affidavits, depositions, stipulations or other documents containing facts that would tend to establish the necessary elements for a transfer. In other words, the defendant provided the court with nothing. Id. at 756-57. In this case, by contrast, Mr. Smith has submitted an affidavit identifying witnesses by category, which courts have found to be sufficient. See Bolton, 549 F. Supp. at 1314-15 (transferring case based on defendant's argument about where the majority of witnesses, generally defined as personnel with decision-making authority, resided). In addition, as discussed below, Defendant has submitted a second affidavit with more specific information about witnesses.

this district and has:

> admitted that Talisman's "royalty/production accounting systems were not well-suited to the complex Texas-lease environment," and that the company "had overestimated its capability to manage [] complex issues [in Texas] based on its experience in other jurisdictions," and "made mistakes in developing its current royalty accounting process." Lison Decl. Exh. 1 at 2, 7, 8. Mr. Normane also admitted that Talisman implemented an across-the-board 20% reduction in royalty payments to account for shrinkage, subject to a later true-up after verification.  Id. at p. 6.

(ECF No. 17 at 6.)

Defendant responds that the document from which Plaintiffs are quoting is a response drafted by Mr. Normane, in his capacity as general counsel, to a complaint made by a former Talisman employee to the Department of Labor (DOL) that he was terminated because he "blew the whistle" about Talisman's royalty payment reduction plan.  The fact that Mr. Normane wrote this response does not make him a witness for purposes of this case.  See Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578, 130 F.R.D. 348, 352 (D.N.J. 1990) (deposition of attorney may be both "necessary and appropriate" where the attorney may be a fact witness such as an "actor or viewer" but not otherwise).

In addition, Defendant argues that affidavits and declarations must be based on personal knowledge.  Fed.R.Civ.P. 56(c)(4).  Moreover, "Internet websites and web postings are … typically inadmissible as hearsay."  Southco, Inc. v. Fivetech Tech. Inc., 982 F. Supp. 2d 507, 515 (E.D. Pa. 2013) (citation omitted), aff'd mem., 611 F. App'x 681 (Fed. Cir. 2015). "Furthermore, even website evidence admissible under a hearsay exception requires authentication."  Id. (citation omitted).  Thus, it argues that Mr. Lison's declaration, which attaches a LinkedIn page about Mr. Normane, would not be sufficient on its own to establish that Normane lives in Pennsylvania.  Plaintiffs have not responded to this argument.

The second witness Plaintiffs identify is Matthew "Matt" Reynolds (former assistant

general counsel with Talisman), who lives in this District and who oversaw an investigation of royalty owners' complaints about Talisman's underpayment of royalties. Defendant does not dispute Mr. Reynolds' status as a witness, but it does contend that Mr. Reynolds does not live here.

Plaintiffs have submitted the declaration of their counsel, Wyatt Lison, who again attaches a LinkedIn page dated July 25, 2016, which states that Reynolds "is now employed by Black Falcon Energy, LLC and resides in the Greater Pittsburgh Area." (Lison Decl. ¶ 7 & Ex. 4.) Defendant responds with the affidavit of its counsel, Robert Theriot, who states that:

> I have personally known Matt Reynolds for five years. I know he is from the Houston area, having worked in Houston out of law school, but eventually relocating to Pittsburgh in connection with his work, and that of his wife who also works in the oil and gas industry. He contacted me in April of 2015 when he left Talisman, and advised me that he was initially staying in the Pittsburgh area. This year, he took a job with Black Falcon Energy, located in Houston. He later sent me a note through LinkedIn that he was moving back to Houston in July of this summer, a true and correct copy of which is attached as Exhibit A. I have since communicated with him and can personally confirm that he is currently working in Black Falcon Energy's offices in downtown Houston and resides in Houston today.

(Theriot Aff. ¶ 3.)[9]

Plaintiffs argue in their sur-reply brief that Mr. Theriot did not provide an affidavit from Mr. Reynolds to state that he would be "unavailable" at trial within this district. However, this is a misleading argument in that, if the question is where Mr. Reynolds resides, Defendant has proffered admissible evidence that he resides in Texas, and if the issue is whether any witnesses are truly "unavailable," neither party has proffered affidavits to support such a contention. As noted above, Mr. Theriot's statement based upon his personal knowledge that Mr. Reynolds is living and working in Houston is unquestionably admissible, unlike Mr. Lison's declaration,

---

[9] Def.'s Reply Br. (ECF No. 19) Ex. 1.

which is based on a LinkedIn page to establish that Mr. Reynolds lives in Pennsylvania.

Defendant identifies five other witnesses (named in the underlying documents attached to Mr. Lison's declaration), all but one of whom reside in Texas and who have information relevant to this case: William Crews (the original "whistleblower" who allegedly uncovered the royalty reduction, who lives in Houston); Nigel Titt (Crews' supervisor, who lives in Calgary, Canada); Cuanto Antes Mejor, LLC (a royalty owner that contacted Crews about the shrinkage issue and operates out of San Antonio[10]); Statoil (Talisman's partner in the joint venture, based in Houston); Sonja Tyler (a Talisman production revenue accountant who was contacted by Crews about the shrinkage issue, who resides in Houston); and Jan Ginther (a putative class member who resides in Houston and who has already initiated her own lawsuit in Texas to complain about her check stubs). (Theriot Aff. ¶¶ 4-8.) Defendant contends that the convenience of all these witnesses would be better served in Texas.

Plaintiffs respond that these individuals and organizations are not "critical" witnesses because they do not have independent knowledge of what occurred. However, they cite no authority to support the distinction of a category of "critical" witnesses and they have not suggested that these individuals and organizations would not be called in the case. Somewhat oddly, they maintain that William Crews (who investigated complaints from royalty owners about underpayments) is not an "essential" witness, but Todd Normane (who drafted Talisman's response to Crews' complaint to the DOL that he was fired for blowing the whistle on Talisman's activities) is such a witness, yet they do not explain this distinction. Again, Plaintiffs provide no basis for the proposition that they possess superior knowledge to Talisman about who

---

[10] As noted above, Defendant acknowledges that San Antonio is not in the same judicial district as Houston, but notes that a person can be subpoenaed for trial within the state where he lives if he would not incur substantial expense. Fed.R.Civ.P. 45(c)(1)(B)(ii).

the witnesses will be in this case, given that the witnesses will have to be individuals and organizations who have or used to have connections with Talisman.

Finally, as noted above, Defendant has proffered evidence that its records reveal that 87% of royalty owners in Talisman's Eagle Ford leases have a mailing address in Texas (Smith Aff. ¶ 10) and Plaintiffs have not disputed this fact.  They argue that Defendant "lacks standing" to argue the inconvenience of the forum for other class members.  However, as Defendant observes, the case Plaintiffs cite to support this argument, Thomas v. United States Lines, Inc., 371 F. Supp. 429 (E.D. Pa. 1974), was not a class action and says nothing about the relevance of other class members.  Defendant, on the other hand, has cited cases which observed that "many of the class members reside over a large area far removed from the forum plaintiff has chosen." Donnelly v. Klosters Rederi A/S, 515 F. Supp. 5, 6 (E.D. Pa. 1981).  See also Firmani v. Clarke, 325 F. Supp. 689, 691 (D. Del. 1971) (when 602 stockholders, or 45% of the total, resided in the Eastern District of Pennsylvania, but only 45, or 3.3%, resided in Delaware, "such a stockholder concentration substantially lessens the significance of the plaintiff's choice of forum here."); DeLoach v. Philip Morris Cos., Inc., 132 F. Supp. 2d 22, 26-27 (D.D.C. 2000) (when most class members lived in North Carolina and only 516 out of hundreds of thousands resided in D.C., transfer was warranted); Seifi v. Mercedes-Benz USA, LLC, 2013 WL 1345132, at *2 (N.D. Cal. Apr. 2, 2013) (all class members resided in California where case was brought, so this weighed against transfer to New Jersey).  Plaintiffs contend that these cases stand only for the proposition that the location of these class members mattered because they were expected to be witnesses; whereas in this case, the class members would not be testifying witnesses.  However, the cases do not make this distinction.

In summary, Plaintiffs cite only one witness who might reside in this district (Todd

Normane), but Defendant contends that he is not a witness but only drafted a response to a complaint as general counsel for Talisman, and also that Plaintiffs have not demonstrated that Mr. Normane actually resides in this district.  Moreover, even if Mr. Normane is a witness, Defendant has identified six witnesses who reside in Texas and Plaintiffs merely respond – without support – that these individuals and organizations are not "critical" to the case.  And 87% of the potential class members reside in Texas.  Defendant has demonstrated that the factor of convenience of witnesses weighs in favor of transfer of this action to the Southern District of Texas.

<u>Location of Books and Records</u>

Plaintiffs argue that Talisman "cannot dispute that the critical records needed for … an accounting are maintained and/or available at its Western Pennyvania headquarters within this District."  (ECF No. 17 at 11.)  Defendant states that:

> Production, accounting, engineering, regulatory, land, and other pertinent records relating to Talisman's Eagle Ford properties and production are located or are accessible in Talisman's office in The Woodlands.

(Smith Aff. ¶ 5.)  Plaintiffs respond that this affidavit does not demonstrate that the records are "maintained" in Texas, but rather only "suggests" that some "pertinent records" are accessible in Texas.  Plaintiffs have not explained the difference between records being "located" in a certain place and being "maintained" there.

Modern technological advances have rendered this factor less significant than it was previously.  Nevertheless, "[t]hat access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous."  <u>In re Volkswagen</u>, 545 F.3d at 316.  <u>See also</u> <u>Link_A Media</u>, 662 F.3d at 1224 ("[w]hile advances in technology may alter the weight given to these factors, it is improper to ignore them entirely.")

Thus, the location of book and records favors transfer, albeit not strongly.

Public Factors

As noted above, the public factors include: the enforceability of the judgment, practical considerations, court congestion, local interest in the controversy, public policies of the fora, and the applicable law in diversity cases.  Plaintiffs argue that Defendant has conceded several of these factors by not addressing them: the enforceability of the judgment; this Court's ADR program will make adjudication of the claims easy, expeditious and inexpensive; this District has a local interest in deciding the controversy; and public policies favor adjudication here. However, the case they cite actually states that a defendant's failure to address a venue factor meant that it "must believe those factors either weigh in favor of Plaintiff or are neutral or irrelevant to this action." PLS, 2010 WL 170403, at *7.  Many of the factors Plaintiffs cite appear to either overlap with other factors, or they are neutral, or they are irrelevant to this case.

Court Congestion

Plaintiffs contend that the court congestion factor weighs in favor of denying transfer: the number of civil and criminal cases pending in this Court as of March 31, 2015 was 2,243, or an average of 125 for each of the 18 judges, compared to a total of 10,506 cases pending in the Southern District of Texas, or an average of 250 cases for each of the 42 judges.  (Lison Decl. ¶¶ 13-14 & Exs. 7-8.)  Defendant responds that, if criminal cases are not considered, the Southern District of Texas has only 117 cases per judge, which is not significantly different from the 102 civil cases per judge for this District.  It also notes that the average time from filing to disposition is actually faster in the Southern District of Texas than in the Western District of Pennsylvania.  (Theriot Aff. ¶ 9.)  It argues that a court should consider average disposition time. The actual holding of the case it cites is that:

> When evaluating the administrative difficulties of court congestion, the most relevant statistics are the median time from filing to disposition, median time from filing to trial, pending cases per judge, and average weighted filings per judge. See REO Sales, Inc. v. Prudential Ins. Co. of Am., 925 F. Supp. 1491, 1495 n. 3 (D. Colo. 1996); Hess Oil V.I. Corp. v. UOP, Inc., 447 F. Supp. 381, 384 (N.D. Okla. 1978).

Employers Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1169 (10th Cir. 2010).

Defendant cites no authority for the proposition that criminal case statistics should be disregarded and as a matter of common sense, if the issue is court congestion, the calculation should include all cases, both civil and criminal.  It cannot be disputed that the Southern District of Texas has a more congested case load than this District, although the median time from filing to disposition is actually faster in Texas.  This factor disfavors transfer, but as explained herein, it is outweighed by the other factors favoring transfer: "Court congestion is not a decisive factor; it must be weighed against all other relevant factors, and district courts within the Third Circuit have not placed 'great importance' on this factor." York Group, Inc. v. Pontone, 2014 WL 3735157, at *13 (W.D. Pa. July 28, 2014).  See also Atlantic Marine, 134 S.Ct. at 574 (observing that "public-interest factors will rarely defeat a transfer motion").

Applicable Law

Plaintiffs contend that there is no conflict between Pennsylvania law and Texas law with respect to claims for breach of contract.  Myers v. Jani-King of Phila., Inc., 2012 WL 6058146, at *8 (E.D. Pa. Dec. 5, 2012).  Therefore, they argue that this Court can apply either state's law to resolve this case and therefore this factor weighs against transfer.

Defendant argues that this is not a simple breach of contract case, but rather a breach of oil and gas leases, which are considered in Texas as conveyances of real property interests consisting of fee simple determinable title to mineral rights in land.  Mitchell Energy Corp. v. Samson Resources Co., 80 F.3d 976, 982 (5th Cir. 1996).  It notes that Plaintiffs request, inter

24

alia, "termination" of the leases (Compl. at 22), a remedy which invokes unique Texas legal

principals concerning whether the alleged breach is one of a covenant or a condition subsequent,

only the latter of which might allow forfeiture of the lease.  Vinson Minerals, Ltd. v. XTO

Energy, Inc., 335 S.W.3d 344, 354 (Tex. App.—Fort Worth 2010).  In addition, Plaintiffs request

specific declarations for statutory relief and compliance with Texas check stub statutes and

related gas provisions under the Texas Natural Resources Code, §§ 91.401-404, 406, 502.

(Compl. at 22.)  Finally, it notes that they request an accounting of gas volumes in compliance

with the requirements of the Texas Comptroller and the Texas Railroad Commission (Compl. at

20), both of which have detailed and unique regulations and policies concerning the reporting of

oil and gas volumes and sales.  (ECF No. 19 at 9 & n.3) (citing Texas oil and gas regulations).

> In their sur-reply, Plaintiffs contend that they:

> complain that their contracts with Talisman do not allow for an arbitrary reduction
> in royalty payments not attributable to an actual observed and recorded amount of
> "shrinkage." Talisman acknowledges this point, and agrees and accounting is
> needed to determine the amount of royalties Plaintiffs and Class Members are
> owed. Dkt. No. 18-01, p. 6 ("Talisman implemented an initial payment based on
> 20% shrinkage of condensate subject to later true-up after verification"); Dkt. No.
> 8, pp. 10-11 (counterclaim asserting an accounting could show it overpaid
> royalties). This Court certainly has the experience and knowledge to read the
> contracts at issue, determine if Talisman's arbitrary across-the-board reduction in
> production volumes violated said agreements, and order an accounting based on
> documentary evidence of royalty payments and volume of oil and gas produced
> and sold. No prior knowledge of unique Texas legal principles will be necessary
> to do this.

(ECF No. 24 at 8.)  However, Plaintiffs have not addressed Defendant's point that the specific

forms of relief requested in the Complaint are unique features of Texas law.

> In conclusion, the main factors resolve as follows: Plaintiffs have selected this forum, but

their choice is entitled to somewhat reduced deference because it was not their home forum and

because this is a class action, and they have not provided any reason for selecting this forum.  In

addition, most of the purported class members reside in Texas.  Defendant's preference is the

Southern District of Texas, where it contends the company personnel responsible for decision

making regarding royalty payments and the relevant documents and records reside.  Where the

facts underlying the claims arose is disputed—Plaintiffs contend that the operative facts occurred

in this District and Defendant maintains that they occurred in the Southern District of Texas—

but on the whole, the evidence points toward Texas as the locus of operative facts.  The

witnesses are almost exclusively in Texas.  The court congestion factor disfavors transfer, but not

strongly.  The case may require a remedy based upon the intricacies of Texas oil and gas

regulations, which are not equivalent to Pennsylvania breach of contract laws on the subject.

Finally, it is noted that this case has not yet had a Rule 16 case management conference and thus

the "interest of justice" is not affected by transferring the case at this early stage of the

proceedings.   For all of these reasons, the balance of factors favors transfer of this case to the

Southern District of Texas, Houston Division.

Therefore, it is recommended that the Motion to Transfer Venue Pursuant to 28 U.S.C.

§ 1404 filed by defendant, Talisman Energy USA Inc. (ECF No. 9), be granted and that this

action be transferred to the United States District Court for the Southern District of Texas,

Houston Division.

Litigants who seek to challenge this Report and Recommendation must seek review by

the district judge by filing objections by September 14, 2016.  Any party opposing the objections

shall file a response by September 28, 2016.  Failure to file timely objections will waive the right

of appeal.

Respectfully submitted,


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: August 31, 2016