UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| RAYANNE REGMUND, *et al*, § | |
| § | |
| PLAINTIFFS, § | |
| VS. § | CIVIL ACTION NO. 4:16-CV-02960 |
| § | |
| TALISMAN ENERGY USA, INC.; cp § | |
| REPSOL S.A., § | |
| § | |
| DEFENDANT. § | |

**MEMORANDUM & ORDER**

Pending before the Court is Plaintiffs' Motion for Class Certification. (Doc. No. 50.) The Court heard oral argument on the motion at class certification hearings on April 9, 2018, on August 29, 2018, and at a two-day hearing on March 28 and 29, 2019. The parties have submitted numerous rounds of briefing, which have been uniformly well-argued. The primary focus of the parties' arguments has been on the adequacy of putative class representatives, specifically the potential for intra-class conflicts, and on whether questions of law or fact common to class members predominate over any questions affecting only individual members.

I.  BACKGROUND

  A.  Royalties

Plaintiffs are the royalty owners on oil and gas leases. Plaintiffs have brought claims for breach of contract, accounting, and unjust enrichment, and seek declaratory judgment. (Doc. No. 61.)

1

In 2010, Defendant Talisman[1] entered the Texas oil and gas market in the Eagle Ford Shale region in a joint venture with Statoil. From 2013 to 2016, Statoil and Talisman divided the operations of the wells. (Doc. No. 55-1 ¶ 5.) Throughout this time, Talisman continued to take, market, and pay royalties on its share of the production from all wells. (Doc. No. 55-1 ¶ 5.)

Talisman and/or Statoil operated 468 wells in the Eagle Ford Shale region from which Talisman paid royalties pursuant to approximately 2,920 leases. (Doc. No. 51-3 at A5.) There are 3,957 royalty owners who have been paid by Talisman. (Doc. No. 51-3 at A5.)

The wells produce oil/condensate and natural gas. (Doc. No. 55-1 ¶ 10.) At the well level, as it is produced, the oil, gas, and water components are separated and metered. The components are recombined or "commingled" when they enter the stabilization facility. (Doc. No. 51-4 at A32-A33.) Some of the Eagle Ford Shale production is fairly stable "black oil," which requires little to no treatment before sale. (Doc. No. 55-1 ¶ 12.) Other production is "wet gas," which requires processing called stabilization. (Doc. No. 55-1 ¶¶ 12, 17.) Stabilization of wet gas produces "flash gas" by removing lighter hydrocarbons from the oil and condensate; flash gas results in a reduction or "shrinkage" of the volume for sale. (Doc. No. 55-1 ¶¶ 17-18.) Flash gas can then be separately processed or sold as residue gas and natural gas liquids ("NGLs").

In an answer to interrogatories, Defendant explained its method of volumetrically calculating royalties.

> Royalties are calculated based on the sales value of each product . . ., multiplied by each owner's royalty share of each product . . . and adjusted for Talisman's participation in the well. Applicable post-production charges . . . are applied as

---

[1] On December 30, 2016, Talisman Energy USA Inc. became Repsol Oil & Gas USA, LLC. It is referred to as "Talisman" in this Order, as it was in the briefing.

appropriate under the leases, other instruments, and Texas law.

Some of Talisman's oil and gas leases have special, added, or non-typical royalty provisions that require royalties to be calculated on volumes or values other than sales, and to that extent, Talisman's specific calculation methodology may have been different depending on the specific lease requirements.

Generally, royalty volumes are determined based on calculated sales volumes allocable to each well. For example, natural gas, where processed, is paid based on the ultimate residue volume available for sale at the tailgate of the processing plant. Likewise, the royalty volume of condensate is calculated based on the ultimate volume available for sale after stabilization in treatment facilities of tankage on lease. As it concerns much of the production in the Eagle Ford, condensate must be stabilized to achieve a saleable product; this stabilization results in a reduction of the volume of condensate, as measured at the well separator, compared to the volume available for sale. Likewise, the stabilization results in the generation of flash gas, which is added to the gas stream, resulting in a corresponding increase in the residue gas and NGLs available for sale which is allocable back to the well. A significant portion of the condensate shrinkage and flashing occurs in the central facilities stabilization equipment which is fed by multiple wells. This shrinkage and flashing occurs before the condensate can be shipped for sale or the gas transported to NGL processing plants for further processing and ultimate sale.

For condensate, in the Statoil-operated area due to the lack of allocated sales volumes from Statoil and concerns regarding the reliability of the data from Statoil, the Company recorded as sales volumes the actual measured wellhead separator volume of

3

un-stabilized condensate from each well. Since sales volumes are less than raw wellhead un-stabilized condensate volumes the Company applied an estimate of the overall shrinkage. The overall area-shrinkage estimate factors applied were 0% for production for the period August 2013 through February 2014, 20% for production for the period March 2014 through October 2014 and December 2014, and 30% for production for the period January 2015 through March 2016. For November 2014, the actual sales volumes were allocated to the wells on the basis of the wellhead condensate meter. After March 2016, Talisman has relied on the allocations provided by the operator, Statoil.

For purposes of allocating condensate production in the Talisman-operated area, actual sales volumes for the wells were recorded based on truck tickets and volumes delivered from central stabilization facilities into the pipeline. For the volumes that were delivered to the pipeline, these volumes were allocated back to the wells proportionately based on the condensate wellhead un-stabilized production volumes. Since Talisman was able to utilize actual trucked and pipeline volumes (i.e. sales volumes) to determine and allocate well condensate production available for sale, no additional shrinkage factor was necessary to apply to these volumes.

For Gas and NGLs in both the Talisman and Statoil operated areas, reported sales volumes and prices from third-party plant statements were used to allocate the production sales volumes of residue natural gas and fractionated NGLs received at the plant or fractionator back to each well based on the compositional make-up of the gas as analyzed at the wellhead. This allocation took into account fuel usage and addition of flash gas. Because actual sales volumes were used to determine and allocate the production available for sale from each well, no further shrinkage factor was necessary to apply to

these residue gas and NGL volumes.

(Doc. No. 51-3 at A5-A7.)

Plaintiffs Rayanne Regmund Chesser, Gloria Janssen, Michael Newberry, and Carol Newberry filed this class action suit against Defendant Talisman Energy USA, Inc. in the Western District of Pennsylvania in 2016, and the case was subsequently transferred to the Southern District of Texas. Plaintiffs take issue with the volumetric allocation and estimated shrinkage Defendant used in its royalty calculations. Plaintiffs argue that their leases require a calculation of royalties based on the amount of production ultimately available for sale. First, Plaintiffs object to the commingling of the leaseholders' gross production of oil and gas, and the volumetric allocation of the net sales volumes. Second, Plaintiffs object to the calculation of royalties; they challenge the shrinkage estimates applied and estimated sales volumes. Plaintiffs' position is that liability can be established as a class, and then individualized damages can be determined from business records without mini-trials.

Plaintiffs seek to certify a Rule 23(b)(3) class, which they define as:

> All persons who, pursuant to an oil and gas lease, received between January 1, 2013 and June 1, 2016 ("Class Period"), royalty payments from Defendant Talisman Energy USA, Inc. ("Talisman") attributable to production, including but not limited to gas, oil, condensate and all hydrocarbons separated, extracted or manufactured from gas that was commingled with production from one or more other wells, and to whom Talisman paid such royalties using a volumetric allocation methodology of net production sold and/or estimated "shrunk" production volumes.
>
> Excluded from this class are (a) all government entities, including federal, state, and local governments and their respective agencies, departments or instrumentalities; (b)

5

any foreign citizens, states, territories or entities; (c) owners of any interest and/or leases located on or within any federally created units; (d) owners of any non-operating working interest for which Talisman or its agents or representatives, as operator, disburses royalty; (e) Talisman and any entity in which Talisman has a controlling interest and their officers, directors, legal representatives and assigns; and (f) members of the judiciary and their staff to whom this action is assigned.

(Doc. No. 50 at 2.)

## II. MOTION FOR CLASS CERTIFICATION

### A. Legal Standard

The requirements for class certification under Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable [numerosity];

(2) there are questions of law or fact common to the class [commonality];

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed. R. Civ. P. 23(a). Plaintiffs, as the party seeking certification, bear the burden of proving that the proposed class satisfies the requirements of Rule 23. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551 (2011).

In addition to the requirements of Rule 23(a), Plaintiffs must meet the requirements of one of the subparts under Rule 23(b). *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). Plaintiffs seek certification under Rule 23(b)(3), which allows for certification if "the court finds that the questions of law or fact common to class members predominate over any

6

questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### B. Analysis

Plaintiffs seek to certify a class of nearly four thousand Texas mineral owners to challenge Defendant's "failure to properly report, account for, and make royalty payments in accordance with [putative class members'] materially similar lease agreements from January 1, 2013 through June 1, 2016." (Doc. No. 51 at 1.)

#### i. Numerosity

To satisfy the numerosity requirement under Rule 23(a)(1), the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The parties appear to agree on numerosity: there are about four thousand putative class members. (Doc. No. 163 at 17.) Talisman operated 468 wells and paid royalties pursuant to approximately 2,920 leases. The Court finds that the numerosity requirement has been met.

#### ii. Commonality

"To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). Plaintiffs' claims "must depend upon a common contention [that is] of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

As the Fifth Circuit has explained, however, "this contention need not relate specifically to the damages component of the class members' claims. Even an instance of injurious conduct,

which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'" *Deepwater Horizon*, 739 F.3d at 810. If the common question is based on a single course of conduct by defendant, a court must find that the "common course of conduct provides a class-wide basis for deciding significant common issues of fact and law." *Frey v. First Nat'l Bank Sw.* 602 F. App'x 164, 172 (5th Cir. 2015) (unpublished).

Plaintiffs identify the following common questions:

1. Whether Talisman's application of a field wide shrink when "estimating" sales for allocation royalty payment[s] was a violation of industry standards;
2. Whether the use of volumetric allocation of net sales from commingled production was a violation of industry standards;
3. Whether Talisman's common course of conduct—shrinkage/misallocating—breached class members['] lease agreements;
4. Whether Talisman as the party of greater knowledge bears the burden to establish with reasonable certainty each royalty owners['] aliquot share of commingled production and net sales;
5. Whether Plaintiffs' claims of commingling and burden shifting represent an impermissible collateral attack upon Texas Railroad Commission orders;
6. Whether recoupment for any alleged overpayments to royalty owners is barred by the voluntary payment doctrine, statute of limitations, and/or laches.

(Doc. No. 163 at 19-20.)

The Court finds that these common questions satisfy the commonality requirement, with the exception of number three. *See* Section II.B.v.a, *infra*. A more significant hurdle for Plaintiffs is the predominance inquiry.

### iii. Typicality

"Rule 23(a) requires that the named representatives' claims be typical of those of the class." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007). The analysis focuses on whether the named representative's claims are typical, not whether the representative is. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002).

Typicality presents a hurdle for Plaintiffs, because it is unclear whether all the leases are materially similar, and whether they were overpaid or underpaid under Defendant's royalty calculations. These issues are discussed further below.

### iv. Adequacy

The adequacy inquiry can be broken up into three subcategories: (1) "the zeal and competence of the representative[s'] counsel"; (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (3) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017). To meet the adequacy requirement, "the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). Here, Defendant argues that an impermissibly high risk of conflicts of interests exists among the putative class members.

#### a. Over- and Underpaids

Defendant argues that there is a risk of conflict between "overpaids" and "underpaids." Plaintiffs allege that two methods of Defendant's royalty calculation process breached their contracts: using volumetric allocation instead of a compositional allocation that accounts for actual well production, and estimating shrinkage factors.

9

For the putative class members' whose royalty payments were determined by estimating their share of the sales volume instead of using the actual production volumes ultimately sold, the total sales volume is known and will remain the same. Switching the calculation from an estimate (which overpays one person and underpays another) would move money around within the class, but not affect the total sales volume. (Doc. No. 155 at 255:4-11.) If ultimately successful, the underpaid class members would receive additional payouts, whereas the overpaid class members may be subject to Defendant's counterclaim for recoupment.[2] (Doc. No. 79 at 12 (pleading counterclaims against plaintiffs for recoupment).) Putative class members' right to opt out will not solve the problem, because members will not know until a much later stage in the case whether they were underpaid or overpaid. (Doc. No. 155 at 255:12-16.)

For the putative class members' in the east area whose royalty payments were subject to "shrinkage," Plaintiffs previously argued that there potentially remained unpaid royalties from excessively high shrinkage rates, and that recovery was not a zero-sum game. At the final class certification hearing, Defendant's expert could not say that the total royalty payments had been made. (Doc. No. 158 at 86:7-11 ("A: And you would have to do a revenue audit in order to know if they paid all the pie? A: I would have to do an audit.").)

However, at the same hearing, the Court directed Defendant to confirm with his client whether he could "represent knowledgably that all the money was paid out," and to include that information in the post-hearing briefs. Defendant did so, and included a supplemental declaration swearing that "all actual sales volumes and revenues attributable to royalty interests in the east area have been paid out to royalty owners," and that shrinkage was never used in the west area.

---

[2] Plaintiffs argue that Defendant's recoupment claim is barred by the voluntary payment doctrine, but the issue has not been fully briefed. In addition, the fact of being subject to the counterclaim at all is sufficiently onerous to create the risk of conflict of interest.

(Doc. No. 162-1 ¶¶ 3-4.)

These two pieces of evidence do not conflict. The expert, who did not do an audit, could not say whether the total royalty payments had been made. The declarant, a Manager of Production and Marketing Accounting for Defendant, was in a position to represent that all the royalty payouts had been resolved. If all royalty payouts have been made, the putative class members subject to shrink are also working with a fixed total amount, because the estimated shrinkage was based on gross sales volume and the total shrink divided amongst the class members. (Doc. No. 162-1 ¶ 2.)

Defendant has thus provided evidence that all putative class members are working with the same total "pie," i.e. gross sales volumes, and that recalculating royalty payments based on actual well production will merely split that pie in different ways. This is a problem for the reasons described above—particularly that it could open up the "overpaids" to liability under Defendant's counterclaim.

The most analogous case Defendant cites comes from outside the Fifth Circuit. In *Pickett v. Iowa Beef Processors*, the Eleventh Circuit reversed an order certifying a class because the class included "those who claim harm from the very same acts from which other members of the class have benefitted." 209 F.3d 1276, 1280 (11th Cir. 2000) (citing *Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) (denying certification of all landowners in the vicinity of the airport because, while plaintiffs claimed that the airport decreased the value of their land, other landowners benefitted from the proximity); *Auto Ventures, Inc. v. Moran*, 1997 WL 306895 (S.D. Fla. 1997) (refusing to certify a class of Toyota dealers because the class contained two groups of winners and losers); *Bolin Farms v. Am. Cotton Shippers Ass'n*, 370 F. Supp. 1353, 1357 (W.D. La. 1974)).

Defendant also cites a Fifth Circuit case in which the conflict of interest was seemingly much less severe. *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007). *Langbecker* was an ERISA stock drop case in which individual putative class members' recovery would vary greatly depending on when the jury decided the stock became an imprudent investment. *Id.* at 315. The Fifth Circuit found this conflict of interest was severe enough to reverse the district court's order certifying the class, and remanded for further consideration of adequacy. *Id.*

The conflict of interest here is much more severe than that in *Langbecker*. None of the putative class members in *Langbecker* was being threatened with any kind of clawback counterclaim like that present here. The conflict of interest here also differs from that in *Langbecker*, because it is not a conflict that arises when choosing evidence to present on one element of the claim, but that arises from the pursuit of the claim itself. The class action, if successful, will benefit some class members and may subject others to financial liability. Especially important, this conflict cannot be resolved by opting out, because putative class members will not know whether they were over- or underpaid until the damages calculations are done much further along in the case. (Doc. No. 155 at 255:12-16.) Any attempt to work the conflict into the class definition would render the class unascertainable for the same reason.

### b. Different Methods of Calculating Production Benefit Different Putative Class Members

Defendant argues another conflict of interest will arise from Plaintiffs' eventual decision about how to fairly and accurately calculate the "shrinkage" for condensate production. (Doc. No. 162 at 10-11.) Plaintiffs advocate for a compositional allocation method instead of the volumetric method used by Defendant, which Plaintiffs argue was against industry standard.

[T]he shrink is relatively straightforward. You can take the total sales from the total amount paid during the class period, and that's going to be the shrink. Okay? But we still have to determine where the volumes have to be allocated, how they get back to each royalty owners. And you will hear from several different witnesses that—very admittedly from Talisman, that that meant, because they were using the wrong allocation method, royalty owners were—some royalty owners were underpaid and some were overpaid. And so when you apply this compositional allocation, it's not going to create more volumes that weren't paid on. It's going to say that you paid this person wrong, and you paid this person too much. You paid this one too little. So we've got to move it around.

(Doc. No. 155 at 22:8-21 (opening statement by Mr. Blevins, putative class counsel).)

The problem is that compositional allocation encompasses a variety of different methods of calculating royalties, including "GPM, flash factor hybrid, and component." (Doc. No. 155 at 108:21.) Each of these methods would benefit some putative class members more than others, because they all result in different royalty calculations—different ways of splitting the "pie." (Doc. No. 155 at 226:1-3; 227:3-9.) It is also not improbable that some of the putative class members have knowledge about which method of calculation would benefit them most. (Doc. No. 155 at 228:15-17 ("Q: And are you familiar with situations where people have come in and wanted a change [in allocation method] solely because it benefited them? A: Correct.").) This conflict is analogous to the conflict in *Langbecker*.

The Court finds that these potential conflicts destroy adequacy.

    *v. Predominance*

"The predominance inquiry requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

*Steering Comm. v. Exxon Mobil Corp.,* 461 F.3d 598, 601 (5th Cir. 2006). This analysis requires courts to consider the plaintiffs' case claim-by-claim to determine whether common or individual issues will predominate. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. Jan. 30, 2006).

The Fifth Circuit has taken different approaches regarding how individualized damages may be without destroying predominance. It is clear that "the necessity of calculating damages on an individual basis will not necessarily preclude class certification." *Steering Comm.*, 461 F.3d at 602. "However, where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue *may* predominate over any common issues shared by the class." *Id.* (emphasis added). For example, "[w]here the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried. In such cases, class certification is inappropriate." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 744–45 (5th Cir. 2003) (internal citations and quotation marks omitted).

    a. Materially Similar Leases

Defendant argues that Plaintiffs have not, and cannot, prove their breach of contract claim with common evidence, because breach and fact-of-damage must be determined lease by lease. Texas law requires courts interpreting provisions of contracts to look at the document as a whole, and not focus only on the provision being interpreted. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("[C]ourts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the

14

provisions must be considered with reference to the whole instrument." (internal citations omitted)).

While many of the leases at issue in this case are "Producers 88," that label contains substantial variation, and many of the leases have individualized addendums attached.

> Q: I think you said that what you looked at were some Producers 88s with an addendum, correct?
>
> A: Some of—well, a considerable part of the leases that I looked at were Producer 88s. A large percentage of those leases did have addenda to them.
>
> Q: Okay. Of course, you know that the Producers 88 form comes in a bunch of different varieties, right?
>
> A: Yes. I saw—principally I did see—with respect to the royalty provision, I did see two different Producer 88s with slightly different—excuse me, different wording, yes.

(Doc. No. 155 at 133:8-17 (cross examination of Mr. Huddleston, Plaintiffs' expert, by Mr. Newman).)

> Q: And were those addendums relatively standard as well?
>
> A: Well, they varied. And since I was only addressing how are you paying royalties, I was looking for what's the royalty rate and what does the lease say with respect to the payment of royalties.

(Doc. No. 155 at 78: 20-24 (direct examination of Mr. Huddleston, Plaintiffs' expert, by Mr. Blevins).)

Plaintiffs have provided some evidence that the royalty provisions of the randomly selected sample contracts are materially similar in that they all "start out either with the word 'production' . . . or 'produced.'" (Doc. No. 155 at 77:5-7.) Plaintiffs' expert reviewed 368

15

randomly selected leases as a representative sample of the putative class members' leases. (Doc. No. 155 at 77-79.) Most of the royalty provisions used phrases like "produced and sold" or "produced, saved and sold." (Doc. No. 155 at 77:23-25.) Plaintiffs' expert confirmed that, "speaking as a layperson, certainly not as a lawyer," "it is standard in the industry that . . . these variation[s] of those words mean that royalties are to be calculated and paid on the volume of the production sold or available for sale." (Doc. No. 155 at 77.) However, the Court cannot accept this conclusion, because Texas law precludes it from interpreting Defendant's obligations regarding royalty calculation based on these phrases alone. There is no evidence that the calculation of royalties under the contracts are materially similar as a whole, and Defendant has pointed to evidence that the leases in fact differ quite dramatically in this respect. (Doc. No. 158 at 75:6-76:5, 76:9-19, 77:1-21.) Without evidence that the royalty obligations under the leases are materially similar, Plaintiffs cannot prove Defendant's breach on a classwide basis.

The requirement that courts interpret royalty obligations only after considering the contract as a whole will also make the determination about whether Plaintiffs suffered damage as a result of Defendant's alleged breach impossible to establish on a class-wide basis, because it would require a determination that the estimated volumes Defendant used resulted in *lower* royalty payments than what the class was owed. As the leases vary regarding calculation of royalties, this determination could only be done on an individual basis, and through an examination of the entire lease to make sure no other provision or addenda change royalty obligations.

    b. Breach of Contract Elements

The elements of a breach of contract claim in Texas are "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the

defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 (Tex. 2018).

The existence of a valid contract is not disputed here. The class definition is limited to those individuals paid royalties by Defendant pursuant to an oil-and-gas lease. Neither is the performance of the putative class members being challenged. The crux of the case will be breach and that the class sustained damages as a result of that breach.

Even assuming that Plaintiffs' sampling of the class leases establishes that the leases are materially similar in prohibiting payment on estimates instead of actual production values, and that breach can thereby be proven with common evidence, that is only half of Plaintiffs' case. The other half is proving that the class sustained damage as a result of the breach, and that cannot be done on a class-wide basis, as described above. Further, the actual calculation of damages that would come at the next stage of the case would again require individualized royalty calculations. Even if Defendant has all the inputs, the leases contain variation on what those inputs should be. The formula will have to be adjusted to account for each of these differences.

Under these circumstances, the individualized issues will outweigh the common issues at trial, and the predominance requirement is not met. *See Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]e have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.").

### vi. Superiority

Rule 23(b)(3) requires a determination that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," based upon factors including

the interests of the members of the class in individually controlling the prosecution, the extent and nature of any litigation concerning the controversy already commenced by members of the class, the desirability of concentrating the litigation in a particular forum, and the management difficulties likely to be encountered. Fed. R. Civ. P. 23(b)(3). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prod., Inc.*, 521 U.S. at 617 (citation omitted).

Plaintiffs argue that this case presents a situation in which the total amount of royalties owned may be large, but each individual's recovery will be small. This may be true, but it is not dispositive of the Rule 23 inquiry.

### III. CONCLUSION

The Court finds that, although the putative class presents common questions, those common questions do not predominate over the individualized issues in this case. The class also faces a high risk of intra-class conflicts of interest, which destroys adequacy. The Court finds that it must **DENY** class certification. (Doc. No. 50.)

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 2nd day of July, 2019.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE